IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Angelita Ramon, et al., ) | No. CIV 03-227-TUC-CKJ |
| ) | |
| Plaintiffs, ) | **FINDINGS OF FACT** |
| ) | **AND CONCLUSIONS OF LAW** |
| vs. ) | |
| ) | |
| United States of America, ) | |
| ) | |
| Defendant. ) | |
| ) | |

On April 30, 2003, Plaintiffs filed a complaint against the United States of America alleging that Border Patrol Agent Cody Rouse negligently caused the death of Bennett Patricio, Jr. The parties presented this case to the Court during a five-day bench trial which concluded on December 16, 2005. The Court has heard and weighed the testimony and evidence presented at the trial. The Court has observed the witnesses' demeanor at trial, and has evaluated their candor and credibility. In addition, the Court has reviewed the transcripts from the trial, the exhibits, and the Court's trial notes. Having done so, the Court makes the following findings of fact and separate conclusions of law pursuant to Rule 52(a), FED.R.CIV.P.

**FINDINGS OF FACT**

To the extent these Findings of Fact are also deemed to be Conclusions of Law, they are hereby incorporated into the Conclusions of Law that follow.

1. On January 9, 2002, at approximately 4:15 a.m., Border Patrol Agent Cody Rouse was traveling east on Federal Route 20 near Sells, Arizona on the Tohono O'odham Reservation. Agent Rouse has been a Border Patrol Agent since 1985 and has worked at the Casa Grande substation since 1996.

2. Two other Border Patrol Agents, Eric Vaughn and David Garcia, were following behind Rouse in separate Border Patrol vehicles at that time; Vaughn was traveling behind Rouse, and Garcia was traveling behind Vaughn.

3. The speed limit on this highway is 55 m.p.h.

4. Rouse was traveling at a speed of approximately 45 m.p.h.

5. Federal Route 20 is a narrow, two-lane highway in the middle of a desolate stretch of desert. The highway is steeply sloped on both sides of the road.[1] The road is in an open range area and cattle do, at times, cross or occupy the roadway. On occasion, there are also pedestrians who walk alongside the roadway.

6. It was pitch dark on Federal Route 20 during the early morning hours in question. There is no ambient lighting whatsoever on Federal Route 20 and there was no moon that morning. As Plaintiffs' expert conceded, he could not even see his own feet on that highway when he went to the scene of the accident to conduct visibility tests.

---

[1] Pursuant to the joint request of the parties, the Court visited the scene of the accident on December 2, 2005; this date was chosen by the parties as the Court had already heard testimony from the expert witnesses and there was no moon out that night. The parties obtained the Border Patrol vehicle involved in the accident and placed Plaintiffs' mannequin and Defendant's mannequin near the point of impact. Further, at the joint request of the parties, the Court, the Court's law clerk, and the respective attorneys for the parties got into the Border Patrol vehicle in question and drove towards each mannequin on separate trips to get an idea of the visibility conditions on the night in question. As a result of this visit to the scene, the Court has a better understanding of the circumstances surrounding the accident at issue in this case.

7. In light of these conditions on Federal Route 20, it was Rouse's ingrained habit to always drive on this highway with his bright lights on. Although Rouse wasn't one-hundred percent certain that he had his bright lights on prior to the accident, he believes that he had them on as it was his established habit. There is no credible evidence suggesting that Rouse did not have his bright lights on. Accordingly, the Court finds that Rouse was driving with his bright lights prior to the accident.

8. Unbeknownst to Rouse and the other agents, a young man (Bennett Patricio, Jr.) was lying on the highway just ahead. As both parties concede, no one knows why Patricio was lying in the middle of the highway.

9. Patricio was lying in the middle of the eastbound lane in a semi-fetal position. He was not moving, his back was facing the oncoming eastbound traffic, his head was facing the south side of the road and his feet were closest to the center line in the road.

10. As indicated in the Coroner's Report, Patricio was wearing black pants, a black cloth belt, a navy blue shirt and blue shoes.

11. On this pitch dark night, as Rouse unknowingly approached this darkly clad figure lying in the middle of the road at a speed of 45 m.p.h., he believes that he did not perceive anything in the road until he was within approximately 60 ft. or 2 seconds from hitting the object in the road. At that point in time, the darkly clad object in the road appeared to be an inanimate non-human, non-animal object. He thought the object in the road was possibly a dark rug, blanket, or plastic bag.

12. As such, Rouse attempted to miss the object lying in the road by straddling it between his wheels.

13. As the two lane highway was steeply sloped on both sides, Rouse's options for safely avoiding the object in the road were limited in the seconds he had once he perceived the object. As there is no shoulder, if he swerved to the right, Rouse could have flipped his vehicle on the steep decline on the south side of the road. In addition, if he swerved too far to the left on this narrow road, he could have flipped his vehicle on the adjacent decline on

1 the north side of the road. If he swerved to the left, but not off the road, he would swerve
2 into the oncoming lane of traffic.

3     14. As Rouse quickly adjusted the wheel to straddle the object in the road, he realized that
4 it was a human being. He had a split second recognition that it was a human as the body
5 passed under his vehicle. Patricio was instantaneously killed as his body was caught on the
6 undercarriage and rear tires of the vehicle.

7     15. Despite the fact that it was pitch dark, Patricio was lying in the middle of the highway
8 in all dark clothing, and Rouse was driving approximately 10 miles under the speed limit
9 when he encountered Patricio, Plaintiffs argued that Rouse's negligence caused the death of
10 Patricio, and that the United States should be ordered to compensate Plaintiffs for his
11 wrongful death. To support this claim, Plaintiffs attempted to show that Rouse was not
12 credible by focusing on statements he made after the accident, and that he violated the "rules
13 of the road." They also relied on the expert testimony of Tim Bright who testified that Rouse
14 had plenty of time to see Patricio and to avoid him. There was no credible evidence
15 introduced at trial to support these claims.

16     16. As to the "rules of the road," for example, Plaintiffs argued that Rouse violated two
17 rules: (a) "over driving his headlights"; and (b) "if you don't know what's on the road, you
18 try to avoid it." However, as discussed in the conclusions of law below, the only governing
19 rule in this case is negligence law as defined by the Arizona courts; namely, whether Rouse
20 acted as a reasonable, prudent person under the circumstances of this accident. In addition,
21 Rouse did attempt to avoid the unknown object in the road. He attempted to safely avoid
22 hitting the body by straddling it between his wheels in the seconds he had before impact. As
23 discussed above, his options to safely avoid hitting the body were quite limited given the fact
24 that he was unable to identify Patricio as a human until 2 seconds before impact and this was
25 a narrow, two-lane highway with steep declines on both sides of the road.

26     17. As to "over driving his headlights," Plaintiffs essentially claimed that one is driving
27 too fast and therefore unsafely anytime one is unable to avoid any hazard that appears in
28 one's headlights. However, to apply this rigid "rule" advanced by Plaintiffs would require

- 4 -

1 drivers to exercise super human judgment to avoid any hazard that could possibly appear in
2 their headlights.  Drivers would be forced to voluntarily reduce their speed by 10, 20, 30, or
3 40 m.p.h. under the posted speed limit such that they could avoid any unexpected hazard.
4 Under Plaintiffs' rule, even if the unexpected object in the road was nearly impossible to
5 perceive until it was too late to safely avoid hitting it, the driver would be held liable and
6 forced to pay damages.  Thus, as Defendant's expert testified, this rule can not be applied
7 rigidly.  Rather, the appropriateness of the rule depends on when a hazard can reasonably be
8 perceived which encompasses lighting, color, texture, movement, and other visual cues
9 which would alert the driver to the presence of a hazard that must be avoided.  Accordingly,
10 the Court rejects the rigid application of the "rules of the road" advanced by Plaintiffs which
11 would lead to unfair and absurd results.[2]

12  18. Plaintiffs also asserted that Rouse is not credible and therefore his account of the
13 circumstances surrounding the accident should not be accepted by the Court.  Plaintiffs
14 essentially advanced a conspiracy theory whereby Rouse attempted to hide the true facts
15 underlying the accident.  To support this contention, for example, Plaintiffs relied on a few
16 inconsistent and marginally relevant statements made after the accident.  Plaintiffs also
17 asserted that Rouse had a motive to lie because he was disciplined several years earlier by
18 the Border Patrol; however, the minor discipline at issue was unrelated to the material facts
19 in this case.  While Rouse made a few inconsistent statements, it was clear that they were
20 innocent mistakes which were not intended to deceive anyone.  Further, to the extent certain

---

[2]Because Rouse was previously aware of occasional walkers on the side of the road and cattle on the road itself (this area was an open range), Plaintiffs also suggested that he should have been on notice of a possible body in the road.  However, this claim is without merit.  A person of Patricio's stature is nowhere close to the proportions of a cow or bull which could be seen at a much greater distance than a human laying stationary in the road.  Further, an upright, moving pedestrian would also be noticed at a greater distance than a motionless, darkly clad figure laying in the road.  Lastly, Rouse's awareness of cattle and walkers on the side of the road surely did not give him any expectation of encountering a motionless human, laying in a semi-fetal position, on a pitch dark highway, with a posted speed limit of 55 m.p.h.

- 5 -

1 statements were made shortly after the accident, there is no question that Rouse was deeply 2 disturbed by the accident and was in some sort of shock. At trial, Rouse described the scene 3 of the accident as "extraordinarily upsetting." Lastly, as this accident occurred on the 4 Tohono O'odham Reservation, there was no dispute that the Tohono O'odham Police 5 Department ("TOPD") was responsible for the investigation. Within minutes of the TOPD 6 initially securing the accident scene, Rouse approached TOPD officers to inform them that 7 he had run over the body. Rouse remained at the scene to answer any questions the TOPD 8 officers had for him, and TOPD Officer Kopcsik (the first TOPD officer to arrive at the 9 scene) testified that Rouse was not evasive and fully cooperated in the investigation. Indeed, 10 after the TOPD completed its investigation, it concluded that this was an unavoidable 11 accident.[3] In short, Rouse was a credible witness and the evidence at trial did not support 12 Plaintiffs' conspiracy theory.[4]

13   19. Plaintiffs also relied heavily on the expert testimony of Tim Bright who concluded 14 that based on his tests, Rouse had sufficient time to avoid hitting Patricio. Bright, a self-15 employed accident reconstructionist, visited the scene of the accident once during the day 16 and four times at night. According to Bright, the purpose of these visits was to obtain 17 maximum distances at which one could clearly identify a human form in the road under 18 similar conditions as the accident in question. On his first visit to the scene during the day, 19 Bright examined the scene, taking measurements and photographs. On his first nighttime 20 visit to the scene, Bright testified that he did some preliminary vision analysis whereby one

---

[3] The parties stipulated into evidence the deposition testimony of Detective Richard Henry. Detective Henry was the lead TOPD Detective in charge of investigating the accident in question. Detective Henry had been doing accident reconstruction since 1995, had conducted hundreds of accident reconstructions, and also attended Northwestern University's Advanced Accident Reconstruction Schools. Upon the completion of his investigation, Detective Henry concluded that this was an unavoidable accident.

[4] The conspiracy theory also proposed that another Border Patrol Agent, George Diaz, was responsible for Patricio being on the roadway. This part of the theory was abandoned by Plaintiffs' counsel at trial. The Court agrees that there was no evidence to link Agent Diaz to the accident.

of Plaintiffs' attorneys laid in the road in dark clothing, Bright slowly drove a vehicle towards the body in the road, and he found that he could clearly see the body at 311 ft. with his bright lights on. On his second nighttime visit, Bright attempted to conduct scientific tests at the scene, but as he did not have permission to be there from Tohono O'odham officials, he was escorted off the reservation before conducting any tests.

20. Based on the results of his third nighttime visit to the scene, Bright generated his expert report which concluded that Rouse was negligent. The purpose of this visit was to conduct scientific testing and mimic the conditions of the accident as closely as possible. For this visit, Bright obtained an "exemplar" vehicle which he said was similar to the Border Patrol vehicle involved in the accident. He then obtained a mannequin and attempted to dress it in clothing similar to the clothing Patricio wore the night of the accident. Bright laid the mannequin in the vicinity of the scene of the accident, backed up his exemplar vehicle until the mannequin was out of sight, and slowly rolled towards the mannequin with his bright lights on. Bright testified that he stopped his exemplar vehicle at a point in the road where a human form was first clearly identifiable; he measured this sighting distance at 314 ft. Bright's assistant, Tim Condon, then took pictures of the mannequin from the cab of the truck from that 314 ft. distance; Bright testified that these pictures accurately represented what he could see at the scene. Because Bright's expert report received numerous criticisms regarding its accuracy from Defendant's expert, Bright subsequently visited the scene for a fourth nighttime round of testing which resulted in a "supplemental" expert report with new maximum visibility distances. Nevertheless, Bright testified that the 314 ft. number from the third nighttime visit was the most accurate out of all of his tests.

21. As Bright testified, the 314 ft. distance was a number obtained while conducting a test where he expected to see a human form in the road. Further, Bright placed the human form in the road himself, backed his vehicle away from the mannequin, and slowly inched towards the mannequin in his truck while looking in the center of the lane for the mannequin. Thus, as Rouse was traveling towards an unexpected body in the road at 45 m.p.h., Bright testified that he had to account for perception/reaction time ("PRT") which is the time it takes to

1 perceive a hazard, understand the hazard, decide what to do, and execute the proper action.
2 Bright concluded that a PRT of 2 seconds was applicable under these circumstances due to
3 the nighttime conditions. Based on the numbers used by Bright, including the 314 ft. number
4 which he said was the most accurate visibility distance with bright lights, the calculations for
5 time and distance to stop were: (a) to convert speed into feet per second, Rouse's speed of 45
6 m.p.h. is multiplied by 1.47 which equals 66.15 ft.; (b) the 2 second PRT multiplied by 66.15
7 equals 132.3 ft.; (c) using a coefficient of friction of 0.7 which Bright testified was
8 appropriate for the road surface at issue, the braking distance at a rate of 45 m.p.h. would be
9 96.4 ft.; (d) however, to determine total stopping distance, the 2.0 second PRT distance of
10 132.3 ft. is added to the 96.4 ft. braking distance which equals 228.7 ft.; (e) subtracting the
11 228.7 ft. total stopping distance from the maximum citing distance of 314 ft. equals 85.3 ft.
12 Thus, as Bright testified, there was a total stopping distance of 228.7 (132.3 ft./2 second PRT
13 + 96.4 ft. braking distance) which means that Rouse could have avoided the accident if he
14 reacted to Patricio's body in the roadway within 3.457 seconds (228.7 stopping distance
15 divided by 66.15 ft. per second) of impact. As such, using the maximum sighting distance
16 of 314 ft. minus the total stopping distance of 228.7 ft., Bright believed that Rouse could
17 have missed the body by 85.3 ft. by braking alone. Bright opined that Rouse could have
18 swerved to avoid the body anytime sooner than 2.5 seconds from seeing the body.

19    22. Based on his tests and the subsequent calculations using the above numbers and
20 slightly different numbers for various visibility distances and PRT numbers for braking and
21 swerving, Bright's conclusion was that Rouse had adequate time to stop and was negligent
22 when he ran over Patricio's body. However, the Court finds the expert opinion of Bright to
23 be flawed and incomplete for the reasons stated herein. Further, the Court credits the expert
24 testimony of Defendant's expert over Plaintiffs' expert.

25    23. Bright testified that he graduated from several accident reconstruction schools,
26 including a program at Northwestern University. This program consisted of two pass/fail
27 courses (a two week course and a five week course). He took these two courses over 20
28 years ago. Bright admitted that he has no college degree, no associates degree, and has only

taken a minimal amount of math and science classes at a local community college. Bright did conduct accident investigation as a police officer with the Tucson Police Department from 1968 to 1980; he also provided training to other officers. He has reconstructed over 2000 accidents and has testified in court as an expert. Bright admitted that he has no formal education in medicine, engineering, or how the human eye works. He currently belongs to no professional organizations in his field and has never published an article in his field of expertise.

24. In conducting his third nighttime test at the scene of the accident which was the basis for his expert report, Bright testified that it was important to mimic the circumstances of the accident as closely as possible. Although the actual Border Patrol vehicle involved in the accident was available for testing, Bright chose not to use this truck; the Border Patrol vehicle at issue was a 2001 Dodge truck. Instead, Bright used an "exemplar" vehicle which was his ex-brother-in-law's 1997 Dodge truck. Bright also admitted that the lighting system (i.e. the illumination power of the headlights) of the vehicle was important for testing purposes, and that the lighting system of the exemplar vehicle was different from the lighting system of the Border Patrol vehicle at issue. Bright also generally agreed that visual cues next to the mannequin in the road would be inappropriate. However, in his tests, his assistant's truck (Paul Condon) was parked on the side of the road adjacent to the mannequin in the road; the truck had a bright, shiny, reflective license plate which was adjacent to the darkly clad mannequin in the road. Further, Bright approved various pictures which he said represented the visibility of the mannequin in the road from varying distances. However, Bright's assistant digitally removed the truck with the shiny, reflective license plate from pictures, and Bright approved the digitally altered picture as representative of the scene and visibility of the mannequin that night. On cross-examination, Bright still insisted that the truck with the shiny, reflective license plate adjacent to the mannequin did not serve as a visual cue and that the digitally altered pictures that he submitted were appropriate. In addition, although there was no moon on the night of the accident, Bright conducted his test on a night when there was at least a partial moon present. Again, although Patricio's body

- 9 -

1  was laying on a part of the road that was completely flat, Bright placed the mannequin at a
2  site further down the road which had a rise in the road which could serve as a visual cue.

3  25. As mentioned above, based on the numerous problems pointed out by Defendant's
4  expert regarding Bright's testing procedures forming the basis for his expert report, Bright
5  went out to the scene for a fourth nighttime visit to dispel any criticisms of his testing.
6  Although Bright emphasized that all of the actions and procedures related to the testing on
7  the third nighttime visit were appropriate and produced accurate numbers, he conducted his
8  new set of tests free of charge and submitted a supplemental expert report based on those
9  tests. However, out of all his tests, Bright still insisted that the most accurate number that
10 one could clearly identify a human form in the road was the 314 ft. distance stemming from
11 testing done on his third nighttime visit to the scene.

12 26. In both tests stemming from the third and fourth nighttime visits, there were also
13 problems with Bright's mannequin which, in all likelihood, made it more visible than Patricio
14 was on the night of the accident. Although Patricio was wearing black jeans, a navy blue
15 shirt and blue shoes on the night of the accident, Bright's mannequin was dressed in blue
16 jeans, a lighter colored blue shirt, and white and black shoes (there was more white than
17 black on the shoes). The blue jeans also had faded spots on them which would reflect much
18 more light than black jeans; black colors absorb nearly all light whereas lighter colors reflect
19 light back towards the approaching nighttime driver. Additionally, as Patricio was lying on
20 his side in the road, Defendant also pointed out that the hip breadth of the mannequin was
21 important for purposes of evaluating visibility. As Patricio was approximately 5 ft., 9 inches
22 tall and 143 pounds, his stature would place him in just below the 50th percentile for hip
23 breadth which is 13 inches. The hip breadth on the mannequin used by Bright was 17 inches
24 which is in the 99th percentile.

25 27. Bright was also questioned regarding the appropriateness of using a 2 second PRT
26 given the fact that Rouse did not expect to see a body in the highway, he was driving 45
27 m.p.h. on a road in a desolate stretch of desert, it was pitch dark, and Patricio was lying
28 motionless, in a semi-fetal position, in all dark clothing, on the highway. Defendants brought

1   to Bright's attention his testimony in a previous case involving Adrian Smith (the "Smith
2   case"). In the Smith case, as in this case, a pedestrian was struck by a vehicle. In the Smith
3   case, however, there was a pedestrian walking in the road in the Tucson city limits at
4   lunchtime. Further, the pedestrian was a surveyor who was wearing an orange reflector vest
5   and was holding a surveyor pole that protruded eight feet into the air. Under these
6   circumstances, Bright testified that the PRT could exceed 1.5 seconds. Bright also admitted
7   that one could barely snap their fingers once in .5 seconds. Nevertheless, Bright still
8   maintained that Rouse was not entitled to a PRT greater than 2 seconds.[5]

9   28. In calculating the time and distance that Rouse had to avoid hitting Patricio,
10  Defendant's expert relied on research in the field which showed that when there is an
11  expectancy of seeing an object, subjects saw objects at double the distance than the subjects
12  that did not expect to see an object in the road. Thus, if you obtain a sighting distance for an
13  object you expected to see in the road (i.e., the 314 ft. sighting distance used by Bright), that
14  sighting distance should be divided by two in order to account for our ability to see things
15  quicker and thereby at a greater distance when we expect to see an object. Bright disagreed
16  with this position. When asked why he disagreed with this position, he simply stated that he
17  has never heard of that concept and has never seen it in any accident reconstruction
18  publication he has ever read. However, as highlighted on cross-examination, this concept
19  was used by Dr. Gomer in his calculations leading to the conclusion that Rouse had
20  insufficient time to avoid the accident, this issue was block indented and partially in bold in
21  Dr. Gomer's report, Dr. Gomer cited authority for this position in his expert report, and
22  Bright received a copy of Dr. Gomer's report. Nonetheless, Bright failed to address this
23  concept in his rebuttal report, and he admitted at his deposition that his rebuttal report

---

[5]Bright also emphasized that the 2.5 PRT used by Dr. Gomer was too long. Bright testified that the 2.5 PRT is only applicable to 1 in 100,000 people. However, as Dr. Gomer testified, the 1 in 100,000 number Bright used was based on daytime perception times where visual cues are much better than those applicable in this case. Thus, Dr. Gomer maintained that Bright failed to adequately consider the extremely poor visual circumstances Rouse faced in this case, and the 2.5 PRT was a more appropriate number to use.

1  contained all of his disagreements with Dr. Gomer's expert report.  In addition, Dr. Gomer
2  later criticized Bright in a rebuttal expert report for failing to address this issue; again, Bright
3  received a copy of this report.  To support the position that expectancy of seeing an object
4  decreases sighting distances by one-half, Dr. Gomer cited to a publication by Paul Olson and
5  E. Farber called <u>Forensic Aspects of Driver Perception and Response</u> (Second Edition).
6  Bright admitted that Paul Olson is an expert in the field of accident reconstruction, that he
7  respects Olson, and that he also relies on Olson in the course of his duties as an accident
8  reconstructionist.  Bright also admitted that he had Dr. Gomer's expert report for 18 months,
9  and that it was his responsibility as Plaintiffs' expert to address issues he disagreed with in
10 relation to Dr. Gomer's report.  Nevertheless, Bright admitted that he never bothered to look
11 up the citation supporting the position of reducing sighting distances by one-half, and further
12 stated that he didn't think it was important enough to look up.

13    29.  Based on Bright's testing conditions as outlined above and his total failure to address
14 the issue of expectancy pertaining to decreasing sighting distances by one-half when one
15 does not expect to see an object, the Court rejects his conclusions pertaining to the time and
16 distance Rouse had to see Patricio prior to running over him.

17    30.  In contrast, the Court accepts the opinions of Defendant's expert, Dr. Frank Gomer.
18 Plaintiffs failed to introduce any credible evidence materially undermining the opinions given
19 by Dr. Gomer.

20    31.  Dr. Gomer is a human factors engineer which is a discipline that applies a detailed
21 understanding of human capabilities, limitations, expectations and preferences to product
22 design, and also accident reconstruction; his discipline encompasses expertise in human
23 visual perception which includes vision during daytime and nighttime conditions, human
24 thinking, decision making, and complex reaction times.  Dr. Gomer has an undergraduate
25 degree from Colgate University in New York and a doctorate degree in human factors
26 engineering and psychology from Washington University in St. Louis.  To obtain his Ph.D.
27 in human factors engineering, Dr. Gomer's required training included courses in the school
28 of engineering, psychology, and medicine.  In the school of medicine and psychology, his

- 12 -

training included courses in vision, audition, anthropometry, and the manner in which decisions are made. In the school of engineering, his training included systems engineering, safety engineering, accident reconstruction, electrical engineering, and mechanical engineering. Dr. Gomer is a member of the American Society of Safety Engineers, the Human Factors Engineering and Ergonomics Society, the Safety Standards Technical Panel for Underwriters Laboratories, Inc., and was appointed to the Vision Committee of the National Research Council for the Academy of Sciences. Dr. Gomer has also published peer reviewed articles, which include articles on nighttime vision and human reaction time. Dr. Gomer has testified previously in federal and state courts as an expert in human factors, vision and accident reconstruction.

32. Dr. Gomer conducted static[6] tests at the scene of the accident to gather data to determine the time and distance Rouse had prior to impacting Patricio. To properly conduct his tests, he attempted to mirror the conditions on the morning in question. As Patricio was laying on his side in a semi-fetal position on the road, Dr. Gomer obtained a mannequin with a hip breadth that likely matched Patricio's hip breadth; as Patricio was approximately 5 ft., 9 inches tall and 143 pounds, his stature would place him in just below the 50th percentile for hip breadth which is 13 inches. As Patricio was dressed, Dr. Gomer dressed his mannequin in black pants and a navy blue shirt. As there was no moon and it was pitch dark on the morning of the accident, Dr. Gomer conducted research to make sure that his visit to the scene coincided with the absence of the moon. The mannequin was placed in the same area and position Patricio was in before the accident. As such, the mannequin was placed in the

---

[6]Due to problems with PRT, the experts in this case conducted static tests whereby they slowly rolled towards the mannequin, stopped when they saw the mannequin in the road, took measurements, and then incorporated PRTs. If they attempted to drive at 45 m.p.h. towards the mannequin at some unexpected location and attempted to signal (i.e. pressing the brakes to stop, etc.) when the mannequin was first seen to an assistant, there would be problems with the driver's PRT in perceiving and reacting to the mannequin in the road and additional problems with an assistant's PRT in perceiving and reacting to any signals given by the driver. As such, both parties agreed that static tests were more accurate under the circumstances in this case.

1  middle of the eastbound lane in a semi-fetal position; the mannequin's back was facing the
2  oncoming eastbound traffic, the head was facing the south side of the road and the feet were
3  closest to the center line in the road. Dr. Gomer also obtained the actual Border Patrol vehicle
4  involved in the accident.  With the brights on, Dr. Gomer slowly drove the Border Patrol
5  vehicle towards the mannequin until he could perceive a faint outline of a body; he stopped
6  at this point, and measured the maximum sighting distance at 213 ft.

7  33.  After obtaining the maximum sighting distance, Dr. Gomer incorporated a 2.5 second
8  PRT and reduced the sighting distance by one-half in calculating the time and distance Rouse
9  had prior to hitting Patricio.

10  34.  In obtaining these numbers, Dr. Gomer took into account various considerations.  As
11  discussed above, for example, Dr. Gomer reduced the sighting distance by one-half as there
12  have been controlled studies in the field measuring the expectancy factor in perceiving
13  objects; these studies showed that when there is an expectancy of seeing an object, subjects
14  saw objects at double the distance than the subjects that did not expect to see an object in the
15  road.  Thus, where a sighting distance is obtained for an object you expected to see in the
16  road, that sighting distance should be divided by two in order to account for our ability to see
17  things quicker and at a greater distance given expectancy.

18  35.  Further, given the extremely poor lighting and visual cues involved in this accident,
19  Dr. Gomer's 2.5 PRT was a reasonable number to use based on the range of human PRTs in
20  the literature under varying conditions.  For example, drivers expect to see pedestrians
21  walking, standing upright on the sidewalk, and react to oncoming headlights; they do not
22  expect to see an unmoving human laying in the middle of the road.  Research also indicates
23  that 70% of the time drivers are looking straight ahead, while 30% of the time drivers are
24  subconsciously engaged in normal, safe eye movements while driving such as checking the
25  rear and side view mirrors, checking the speed and gas level, and otherwise looking at other
26  sections of the road before them besides the center of the lane the vehicle occupies.
27  Moreover, there are serious degradations in visual function at night due to the physical
28  structure of the eye, especially when it is pitch dark and the object in the road is darkly clad

1 and stationary. As such, our ability under these conditions to perceive form, detail, texture, 2 and color is limited. To be able to recognize and therefore properly react to a hazard, one 3 must be able to determine if that hazard has the capability of moving, may react as one 4 approaches, is a stationary object, etc. These factors, among others, led Dr. Gomer to apply 5 the 2.5 PRT and reduce the maximum sighting distance by one-half to develop a more 6 accurate account of the circumstances Rouse faced immediately prior to the accident.

7   36. Based on the numbers used by Dr. Gomer, incorporating the 213 ft. sighting distance 8 with bright lights, the calculations for time and distance to stop were: (a) again, to convert 9 speed into feet per second, Rouse's speed of 45 m.p.h. is multiplied by 1.47 which equals 10 66.15; (b) the 2.5 second PRT[7] multiplied by 66.15 ft. equals 165.375 ft. (rounded to 165 ft.); 11 (c) the sighting distance of 213 ft. is reduced by one-half to 106.5 ft.[8]; (d) using a coefficient 12 of friction of 0.67 which Dr. Gomer said was appropriate for the road surface at issue, the 13 braking distance at 45 m.p.h. would be 101 ft.; (e) however, to determine total stopping 14 distance, the 2.5 PRT distance of 165 ft. is added to the 101 ft. braking distance which equals 15 266 ft. Thus, as the adjusted maximum sighting distance is 106.5 ft and the total stopping 16 distance is 266 ft, it would have been impossible for Rouse to avoid hitting Patricio by 17 braking as he would have passed the body by 159.5 ft. before he came to a complete stop. 18 Dr. Gomer also performed several other related calculations for breaking and swerving with 19 various PRTs and sighting distances, and again concluded that Rouse could not have avoided

---

[7]As discussed above, Dr. Gomer testified that the 2.5 second PRT was the most appropriate number to use in this case given the extremely poor lighting and visual cues involved in the accident. However, Dr. Gomer also performed calculations using an optimal 1.75 second PRT. Nevertheless, even using this 1.75 second PRT, Dr. Gomer concluded that Agent Rouse could not have avoided this accident.

[8]In his testimony, Dr. Gomer said that one has to take 213 ft. and divide it by one-half which gives you 111.5 ft. However, it appears that Dr. Gomer misspoke as 213 ft. divided by 2 equals 106.5 ft.. To the extent Dr. Gomer mistakenly referred to 111.5 ft. in his testimony, the 5 ft. difference between the numbers had no impact on his conclusion that this was an unavoidable accident; according to Dr. Gomer's numbers, Rouse would have passed the body by over a hundred feet before he came to a complete stop.

- 15 -

1 this accident. Even taking Bright's numbers pertaining to PRT and distances, Dr. Gomer
2 testified that Rouse still would not have been able to avoid hitting Patricio due to the
3 expectancy factor of decreasing sighting distances by one-half when one does not expect to
4 see an object.

5 37. Accordingly, based on the foregoing discussion, the Court finds that this was an
6 unavoidable accident and that Rouse acted as reasonable, prudent person under the
7 circumstances leading to the accident. Plaintiffs have the burden of proof in this case and
8 have failed to meet that burden.

## **CONCLUSIONS OF LAW**

To the extent any of the Findings of Fact contain or include any Conclusions of Law, said Findings of Fact are incorporated herein by reference.

1. As Plaintiffs have sued the United States pursuant to the Federal Tort Claims Act, both parties have conceded that this negligence action is governed by the substantive law of the place where the act or omission occurred. Thus, Arizona negligence law governs this action.

2. "Ordinarily, a plaintiff may maintain an action in negligence if he proves: 1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks 2. A failure on [defendant's] part to conform to the standard required.... 3. A reasonably close causal connection between the conduct and the resulting injury.... 4. Actual loss or damage...." *Ontiveros v. Borak*, 136 Ariz. 500, 504, 667 P.2d 200, 204 (1983)(internal quotes and citations omitted); *see also Hutto v. Francisco*, 210 Ariz. 88, 107 P.3d 934, 937 (Ct. App. 2005)("Negligence requires proof of a duty owed to the plaintiff, a breach of that duty, an injury proximately caused by that breach, and damage."). Plaintiffs have the burden of proof to show negligence by a preponderance of the evidence. *See Harvest v. Craig*, 195 Ariz. 521, 523, 990 P.2d 1080, 1082 (Ct. App. 1999); *Pfeil v. Smith*, 183 Ariz. 63, 65, 900 P.2d 12, 14 (Ct. App. 1995); *see also Pima County v. Pima County Law Enforcement Merit System Council*, 211 Ariz. 224, 119 P.3d 1027, 1031 (2005)(to meet the preponderance of the

evidence standard, a plaintiff must show that the facts supporting the cause of action are "more likely than not to be true").

3. Arizona is a pure comparative negligence state; as such, a defendant can be held liable for negligence damages based on any degree of negligence on his part. *See Church v. Rawson Drug & Sundry Co.*, 173 Ariz. 342, 350, 842 P.2d 1355, 1363 (Ct. App. 1992); *Piner v. Superior Court In and For County of Maricopa*, 192 Ariz. 182, 190, 962 P.2d 909, 918 (1998); *Perez By and Through Perez v. Community Hosp. of Chandler, Inc.*, 187 Ariz. 355, 356, 929 P.2d 1303, 1304 (1997).

4. "Negligence is . . . the failure to act as a reasonable and prudent person would act in like circumstances . . . The test of negligent conduct is what a reasonable prudent person would or would not do under the circumstances . . . [B]efore liability may be imposed for an act (or the failure to act) . . . a reasonable person must be able to recognize danger of harm to the plaintiff or one in plaintiff's situation." *Morris v. Ortiz*, 103 Ariz. 119, 121, 437 P.2d 652, 654 (1968)(internal quotes and citations omitted); *see also Sheehy v. Murphy*, 93 Ariz. 297, 299, 380 P.2d 152, 153 (1963)(a motorist must exercise reasonable care towards pedestrians).

5. "[T]he driver of an automobile at night is not required *under all circumstances* to see any object in the road in front of him which comes within the radius of his lights and be able under all circumstances to stop his car before striking the object. The driver of an automobile at night is guilty of negligence if he collides with an object which he has failed *to see and which an ordinarily prudent driver under like circumstances* would have seen." *Robledo v. Kopp*, 99 Ariz. 367, 371, 409 P.2d 288, 291 (1965)(emphasis in original)(internal quotes and citations omitted); *see also LeRoy v. Phillips*, 97 Ariz. 263, 267, 399 P.2d 669, 672 (1965)(same).

6. Although there is no question that this case involves a tragic accident and Patricio's family has suffered a great loss, the Court is bound by the law and facts at issue in this case. As discussed in detail in the Findings of Fact, this was an unavoidable accident. On the

morning in question, at approximately 4:15 a.m., it was pitch dark on Federal Route 20. The two-lane highway is in the middle of a desolate stretch of desert; there was no ambient lighting or moonlight to illuminate the surface of the road. The posted speed limit was 55 m.p.h., but Rouse was driving 10 m.p.h. below the speed limit. Unbeknownst to Rouse, Patricio was lying in a semi-fetal position in the middle of the eastbound lane of traffic on Federal Route 20. Patricio was not moving, his back was facing the oncoming traffic, and he was wearing black pants, a navy blue shirt, and blue shoes. By the time Rouse could reasonably recognize a human body in the road, it was too late to avoid the accident. Thus, the Court finds that the United States is not liable for negligence as Rouse did not breach his duty of care to act as a reasonable, prudent person under the circumstances of this accident.

## **CONCLUSION**

Accordingly, based on the foregoing, IT IS HEREBY ORDERED that the Clerk of the Court shall enter final judgment in favor of the United States.

DATED this 17th day of February, 2006.

_____
Cindy K. Jorgenson
United States District Judge